Matthew J. Preusch (298144)
**KELLER ROHRBACK L.L.P.**
1129 State Street, Suite 8
Santa Barbara, California 93101
Tel:  (805) 456-1496
Fax (805) 456-1497
mpreusch@kellerrohrback.com

***Attorneys for Plaintiff***
***(Additional Counsel on Signature Page)***

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JAMIE FACENDA, on behalf of himself
and all others similarly situated,

       Plaintiff,

  v.

DRAFTKINGS, INC., a Delaware
corporation,

      Defendants.

Case No. 2:15-cv-08922 GW(GJSx)

**PLAINTIFFS' FIRST AMENDED
CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................1

II.    JURISDICTION AND VENUE.................................................................2

III.   PARTIES ...................................................................................................2

IV.   FACTUAL BACKGROUND......................................................................3

      A.     Fantasy Sports. .......................................................................3

      B.     DraftKings Advertises Itself as a Game of Skill.....................4

      C.     The Game is Rigged................................................................5

      D.     Insider Trading Revealed. ......................................................6

      E.     Plaintiff's Involvement with DraftKings. ..............................9

      F.     DraftKings' Arbitration Clause in its Terms of Use is
             Ambiguous, Unconscionable, and Unenforceable............................10

V.    CLASS ACTION ALLEGATIONS ............................................................13

VI.   CAUSES OF ACTION.................................................................................15

VII.  PRAYER FOR RELIEF ..............................................................................25

VIII. DEMAND FOR JURY TRIAL ...................................................................26

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiff Jamie Facenda ("Plaintiff"), on behalf of himself and all others similarly situated, brings this putative class action, by and through undersigned counsel, against Defendant DraftKings, Inc. ("DraftKings"). Plaintiff states and alleges as follows upon information and belief, based upon, *inter alia*, investigations conducted by and through his attorneys, except as to those allegations pertaining to Plaintiff personally, which are alleged upon knowledge. Plaintiff invokes this Court's jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d).

## I.     INTRODUCTION

1.      DraftKings is an online fantasy sports company through which individuals pay fees to enter contests in the hopes of winning money. DraftKings is a leader in the fantasy sports world and advertises its competitions as games of skill and strategy. In reality, the games are rigged. Only a few participants collect the vast majority of the winnings, and those participants are often the ones who have access to material, non-public inside information.

2.      DraftKings permitted its employees to enter online fantasy sports contests on competitors' websites. DraftKings also permitted competitors' employees to enter contests on the DraftKings' website, knowing that these employees had access to material, non-public information, resulting in a direct and significant advantage over average participants. In essence, Defendant's employees engaged in what is akin to insider trading and allowed competitors' employees to do the same on its website.

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

3.     DraftKings' material misrepresentations and omissions fraudulently induced Plaintiff and the Class to pay money to the DraftKings' website. Plaintiff and the Class paid to compete in a rigged game.

4.     DraftKings' conduct violates the law of California, which protects consumers from unfair and deceptive trade practices such as the conduct alleged herein.

## II.     JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2) because the proposed Class consists of 100 or more members, the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and minimal diversity exists.

6.     This Court has personal jurisdiction over the Defendant because the Defendant has sufficient minimum contacts with California so as not to offend traditional notions of fair play and substantial justice. The Defendant has purposefully availed itself to the forum through the promotion, marketing, and sale of products to California residents.

7.     Venue is appropriate in this district under 28 U.S.C. §1391 because a substantial portion of the events giving rise to the claims occurred here and because this Court has personal jurisdiction over the Defendant.

## III.     PARTIES

8.     Plaintiff is domiciled in and a citizen of Los Angeles County, California.

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiff's legal name is Joseph James Facenda III.  However, Plaintiff goes by the name Jamie Facenda.

9.    Defendant is a Delaware corporation with its principal place of business in Boston, Massachusetts, and is therefore a citizen of Delaware and Massachusetts.

## IV.    FACTUAL BACKGROUND

### A.    Fantasy Sports.

10.    Daily online fantasy sports competitions are a multibillion dollar, unregulated industry. In this industry, the two leading companies are DraftKings, launched in 2012, and FanDuel, launched in 2009. Each company is valued at more than $1 billion and each has more than two million registered participants.

11.    DraftKings is a fantasy sports website that permits individuals to play fantasy sports competitions against other participants on its website. Participants wishing to enter a contest on the DraftKings website create an account on www.DraftKings.com. Individuals must then deposit money into the account in order to play games.

12.    Each game or contest requires an entry fee. Entry fees range from as low as $0.25 to as high as $5,000.

13.    To play a game, individuals create rosters of athletes and then use those rosters to compete against other participants' rosters. Unlike a "traditional" season-long fantasy game, in which participants draft one team before the start of a season and then must play with it for the entire season, with daily online fantasy sports participants can

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

enter a new contest and draft fresh teams every week. In selecting their rosters, users all are given the same imaginary "salary cap" and the challenge is to balance players that will perform well with players who are "under-the-radar" and will not be selected by other participants. Participants earn points when athletes on their team perform well, and the individual with the highest-scoring team gets the prize money. Prize pools can be as large as $2 million.

14.     DraftKings takes a percentage of the total pot in each contest as a fee for hosting the game.

**B.      DraftKings Advertises Itself as a Game of Skill.**

15.     DraftKings advertises heavily both on television and on the Internet. In the first week of the National Football League ("NFL") season alone, DraftKings bought over $23 million worth of television advertisement time.

16.     DraftKings' advertisements sell the idea that if you play smart, you can win big. DraftKings attracts users by promising that the games are "skill" and "strategy" based. Indeed, the only reason DraftKings avoids industry regulation banning online gambling is because DraftKings claims to be a game of skill.

17.     As an example of DraftKings' advertising, a recent DraftKings ad encouraged participants to "use your knowledge and showcase your skills." The idea is: if you really know football, you should be able to win the fantasy football contests, and if you really know baseball, you should be able to win the fantasy baseball contests.

18.     DraftKings CEO, Jason Robins, also publicly analogized DraftKings to the stock market, concluding that it was a game that rewards participants who do their homework[1].

## C.     The Game is Rigged.

19.     While DraftKings claims to be a skill-based game that anyone can win, and attracts users based on that premise, in fact, real world statistics show that the vast majority of winnings go to a disproportionately small number of participants. As few as 1% of the participants take home over 90% of the prize money[2].  According to a recent study of the industry by Sports Business Journal, in the first half of the 2015 Major League Baseball season, at least 85% of participants lost money[3].  By way of comparison, approaching a betting window in Las Vegas and choosing a sports team at random yields a return almost 50% of the time.

20.     The reason for this disparity is that some participants have access to

---

[1] Las Vegas Review-Journal, "DraftKings CEO Compares Fantasy Sports to Chess, Stock Investing" September 29, 2015, available at http://www.reviewjournal.com/business/casinos-gaming/draftkings-ceo-compares-fantasy-sports-chess-stock-investing

[2] Sports Business Journal, "For daily fantasy sports operators, the cure of too much skill" July 27, 2015, *available at* http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx

[3] *Ibid. See also* Bloomberg Businessweek, "You aren't good enough to win money playing daily fantasy football" September 10, 2015, *available at* http://www.bloomberg.com/news/articles/2015-09-10/you-aren-t-good-enough-to-win-money-playing-daily-fantasy-football

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

information that others do not. Access to data relating to any particular player, and analytics related to particular strategies that could increase a participant's chances of winning, are incredibly valuable to anyone competing in a fantasy sports contest. The employees of both DraftKings and FanDuel, as insiders, have easy access to this sort of non-public, highly valuable information.

21.     Employees at DraftKings and FanDuel have access to information including non-public statistics and analytics about the scoring in every prior fantasy sports contest, and information concerning the ownership statistics in every current fantasy sports contest. Employees have been using this information to gain a competitive advantage on the competitor's site. Since 2012, DraftKings' employees have won at least $6 million in prize money on FanDuel, and FanDuel employees have likewise profited from DraftKings. Prior to October, 2015, neither site had a policy prohibiting its employees from playing on other fantasy sports websites.

**D.     Insider Trading Revealed.**

22.     The only reason the public now knows about this consistent pattern of insider trading is because of inadvertently leaked data.

23.     In the third week of the NFL season earlier this year, Ethan Haskell, a mid-level content manager at DraftKings, accidentally released the smoking gun: data not available to the general public. The data showed how many users in that week's Millionaire Maker contest chose each player. This information is highly valuable in

picking a line-up (because it is much easier to win a contest if you choose under-the-radar players), but it is not available to the public until after the lineups for all games are finalized. Having that information early is a huge advantage. Not coincidentally, Haskell placed 2nd in a FanDuel contest that same week and won $350,000[4].

24.     After *The New York Times* broke the scandal on October 5, 2015, the public was outraged. The New York Attorney General's office immediately launched an investigation into the two companies. The Nevada Attorney General's office and the Massachusetts Attorney General's office are also separately investigating DraftKings and FanDuel alleging that the contests are not "games of skill" as claimed, but rather illegal online gambling.  The Federal Bureau of Investigation and the Department of Justice have also recently launched their own investigations.

25.     Additionally, in the weeks following the Haskell leak, a slew of investigative reports revealed even more shocking facts about the DraftKings' scandal. As it turns out, top officials at both DraftKings and FanDuel knew that their employees were playing (and winning) on the competitor's site, and had actually discussed it. In a speech at a Babson College conference on September 25, 2015, DraftKings founder Paul Liberman

---

[4] As clarification, DraftKings' employees did not enter contests on the DraftKings' site. Rather, DraftKings' employees had access to confidential DraftKings' data and used this information to win on FanDuel and vice versa. Because the two sites operate so similarly, confidential information from one website is highly valuable on the other. The two websites typically have the exact same "price" for each player in a given week, and the line-up statistics are virtually identical.

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

told the group, "We have some people who make significantly more money off our competitors' sites than they do working for DraftKings."

26.     DraftKings CEO Jason Robins admitted that he "had reservations" about allowing employees to participate in competitors' fantasy sports games, and had even suggested that his company and its rivals restrict the practice. Robins candidly stated, "I, to be honest, did have some reservations about this, and have spoken in the past with some of our competitors about whether we should have policies such as this one in place." When asked if having advance access to lineup data would give a user a material advantage in a contest, Robins responded, "Oh, of course. Any information like that would give people an advantage."

27.     DraftKings and FanDuel knew that employees were misusing material non-public inside information to gain advantage on the competitor's website. They acknowledged the issue, discussed it, and decided to do nothing about it.

28.     According to Legal Sports Report, "the amount of cross-site play by operator employees is substantial." An industry leader who wished to remain anonymous told Legal Sports Report that "a significant number of the whales (high-volume participants that generate significant revenue) at the top of [Daily Fantasy Sports] sites are employees – often executives – of other sites." In fact, FanDuel's CEO admitted to personally playing fantasy sports on competitors' sites.

29.     In the wake of the scandal, DraftKings and FanDuel have both now changed

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

their policy to prohibit employees from entering contests on the competitor's site. Still, this policy change only comes after the inadvertent leak of the smoking gun and the ensuing media explosion. For far too long, DraftKings actively concealed the fact that its games were rigged. Had Plaintiff and the Class known that they were playing against FanDuel employees who were leveraging material, inside information to gain a strategic advantage, they never would have used the DraftKings website. Plaintiffs and the Class were injured by Defendant's fraudulent, misleading, and negligent conduct.

**E.     Plaintiff's Involvement with DraftKings.**

30.     Plaintiff opened an account on DraftKings on May 6, 2015. Over the course of the summer, Plaintiff regularly added money to his account and paid entry fees to play contests. Since he opened his account, Plaintiff has deposited roughly $310.

31.     Plaintiff relied on DraftKings' advertisements and representations that the contests are ones of skill. Plaintiff had no knowledge that FanDuel employees were also entering the same contests and using their inside information to gain a strategic advantage. Plaintiff did not pay for a rigged game in which insiders could compete against him using non-public information. Had Plaintiff known that he had a material disadvantage in these contests as compared to FanDuel employees, he would not have paid the entry fees and he would not have participated in online fantasy sports on the DraftKings' website.

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

**F.    DraftKings' Arbitration Clause in its Terms of Use is Ambiguous, Unconscionable, and Unenforceable.**

32.    When signing up for a DraftKings account, individuals must check a box agreeing to the Terms of Use. No individual wishing to play a game on the DraftKings website can do so without checking the box agreeing to the Terms of Use. Plaintiff and the Class were not given any opportunity to negotiate the Terms of Use. Individuals must either accept the Terms of Use in the entirety, or forgo using the DraftKings website.

33.    The Terms of Use are accessed via a hyperlink on the registration page, and are contained in eighty-three paragraphs of extremely small and dense font.  A copy of the Terms of Use are attached here as Exhibit A.

34.    DraftKings' Terms of Use are internally inconsistent, ambiguous, and wholly unclear such that individuals signing up for the site do not know to what they are agreeing.

35.    The arbitration clause, specifically, is directly and completely contradicted by the forum selection clause in the following paragraph. The arbitration clause states:

> Any and all disputes, claims or controversies arising out of or relating to this Agreement, the breach thereof, or any use of the Website (including all commercial transactions conducted through the Website) ("Claims"), except for claims filed in a small claims court that proceed on an individual (non-class, non-representative) basis, shall be settled by binding arbitration before a single arbitrator appointed by the American Arbitration Association ("AAA") in accordance with its then governing rules and procedures, including the Supplementary Procedures for Consumer-Related Disputes, where applicable.

Then under the next subheading entitled "Miscellaneous," the second sentence reads:

**10**

> Any claim or dispute between you and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in Suffolk County, Massachusetts.

36.     The two clauses directly contradict each other. In one, individuals are agreeing that all disputes will be resolved in arbitration. In another, individuals are agreeing that all disputes will be resolved exclusively by a court of jurisdiction in Suffolk County, Massachusetts.

37.     The clauses read together are nonsensical. They create a fatal ambiguity such that individuals agreeing to the Terms of Use have no idea to what they are agreeing, and as such, individuals should be bound by neither.

38.     In addition to directly conflicting with the forum selection clause, the arbitration clause is procedurally unconscionable. The arbitration clause is inconspicuously buried in the Terms of Use such that individuals agreeing to the Terms of Use are not on notice of it. The arbitration clause can only be discovered after reading through 83 paragraphs of boilerplate legalese. The clause itself is not bolded or distinguished in any way. Nor does the clause explain to individuals that they are giving up their legal right to bring a lawsuit in court. Any "agreement" to arbitrate on the part of the consumer is purely illusory.

39.     The arbitration clause is also substantively unconscionable. DraftKings unfairly and unconscionably requires that all arbitrations – which must be individual and not class-based – be held in Suffolk County, Massachusetts. This unconscionable venue

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

requirement impairs the ability of Plaintiff, and other residents of California, to bring suit. It would be inordinately expensive, and highly inconvenient, for a California plaintiff to travel to Massachusetts to bring an individual claim in arbitration.

40.     Further, the arbitration clause contains a heavy penalty for any individual attempting to challenge the enforceability of the clause. The clause states:

> In the event that either party initiates a proceeding involving any Claim other than an arbitration in accordance with this Section, or initiates a proceeding involving a Claim under this Section other than in the Forum, the other party shall recover all attorneys' fees and expenses reasonably incurred in enforcing this Agreement to arbitrate and the Forum to which the parties have herein agreed.

If an individual, as here, believes that the arbitration clause is unconscionable and that his or her legal rights have been illegally curtailed, they could be billed thousands of dollars in attorney' fees for even trying to make the argument. Moreover, if an individual attempts to bring a claim anyplace other than "the forum" – and it is wholly unclear if "the forum" is referring to arbitration in Suffolk County, or a court in Suffolk County – he or she will be similarly penalized for DraftKings' own bad draftsmanship.

41.     Taken together, these clauses heavily skew the financial incentives against bringing a claim and have the effect of isolating DraftKings from almost ever being sued by California residents. These clauses are designed to deter lawsuits, and they are effective at doing so. The clause is unconscionable and violates California's public policy.

42.     To the extent the arbitration clause is construed to include a provision

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

delegating challenges to the arbitration provision to the arbitrator, Plaintiff separately challenges the delegation provision.

43.     Plaintiff was not aware of either the arbitration clause or the forum selection clause when he was signing up for DraftKings.

## V.     CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

45.     The proposed Class and Subclass are defined as follows:

All United States residents who deposited money into a DraftKings account on or before October 7, 2015; and,

All California residents who deposited money into a DraftKings account on or before October 7, 2015.

46.     Excluded from the Class and Subclass are the Defendant, its parent companies, subsidiaries, and affiliates; any co-conspirators; federal government entities and instrumentalities of the federal government; states and its subdivisions, agencies, and instrumentalities; and any judicial officer presiding over this matter and his or her staff.

47.     Membership of the Class and Subclass is so numerous that joinder of all members is impracticable. The Class compromises up to two million users across the country and thousands or more consumers throughout California. The Class, however, is readily identifiable from information and records in the possession, custody, or control

of Defendant.

48.     The claims of the named Plaintiff are typical of the Class and Subclass. DraftKings engaged in a uniform course of conduct, marketing its games as games of skill while permitting insiders with non-public information to play. Plaintiff and the Class and Subclass were harmed by DraftKings' fraudulent and deceptive conduct in the same manner.

49.     Plaintiff's claims and those of the Class involve common questions of law and fact, including: 1) whether DraftKings engaged in fraudulent and deceptive conduct in regards to its fantasy sports contests, 2) whether DraftKings violated the law of California when it engaged in fraudulent and deceptive conduct in regards to its fantasy sports contests, 3) whether DraftKings' fraudulent and deceptive conduct harmed Plaintiff and the Class, 4) whether DraftKings negligently or intentionally allowed employees from competitors' websites with access to material non-public information to enter and play its fantasy sports contests, 5) whether DraftKings was unjustly enriched by this conduct, 6) whether Plaintiff and the Class are entitled to damages, restitution, and/or punitive damages, and 7) whether Plaintiff and the Class are entitled to injunctive and declaratory relief.

50.     These common questions predominate over any questions affecting only individual class members.

51.     The named Plaintiff will fairly and adequately protect the interests of the

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

Class because he has no interests antagonistic to, or in conflict with, the Class that Plaintiff seeks to represent.  Furthermore, Plaintiff has retained counsel experienced and competent in class action litigation.

52.   Defendant has acted on grounds generally applicable to Plaintiff and the Class as alleged herein, thereby making appropriate final injunctive or corresponding declaratory relief and incidental damages with respect to the Class as a whole.

53.   Class action treatment is a superior method for the fair and efficient adjudication of this controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender.

54.   Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing

55.   Plaintiff realleges by reference, as if fully set forth herein, all of the above paragraphs.

56.   Plaintiff and the Class have contracted with DraftKings to participate in

games of skill involving fantasy sports contests as embodied in the DraftKings Terms of Use.

57.     Under California law, all contracts impose upon each party to a contract a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain is bad faith in the performance of contracts.

58.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, and interference with or failure to cooperate in the other party's performance.

59.     In hosting a fantasy sports tournament that is advertised as a game of skill, there can be no more important implied covenant than the covenant to run the tournament in a fair manner that does not advantage one group of participants over others and that affirmative steps will be taken to prevent participants from using a secret, unfair advantage to the detriment of other participants.

60.     DraftKings' active concealment of the fact that its games were rigged and

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

that Plaintiff and the Class were playing against FanDuel employees who were leveraging material, inside information to gain a strategic advantage and DraftKings knowingly allowing FanDuel employees to play against Plaintiff and the Class while leveraging material, inside information to gain a strategic advantage breached DraftKings' covenant of good faith and fair dealing in the Terms of Use.

61.    Plaintiff and the Class have performed all, or substantially all, of the obligations imposed on them under the Terms of Use.

62.    Plaintiff and the Class have sustained damages as a result of DraftKings breach of the covenant of good faith and fair dealing.

## SECOND CAUSE OF ACTION
### Unjust Enrichment

63.    Plaintiff realleges by reference, as if fully set forth herein, all of the above paragraphs.

64.    DraftKings has benefitted and been enriched from its unlawful and deceptive conduct by accepting the benefit conferred by Plaintiff and the Class in the form of entry fees and deposits on its site.

65.    DraftKings knowingly received and retained the wrongful benefit from Plaintiff and the Class. DraftKings acted in conscious disregard of the rights of Plaintiff and the Class.

66.    DraftKings' ill-gotten gains were at the expense of Plaintiff and the Class and it would be inequitable for DraftKings to be permitted to keep these gains.

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

**THIRD CAUSE OF ACTION**
**Violation of the "Unfair" Prong of the UCL**

67.   Plaintiff realleges by reference, as if fully set forth herein, all of the above paragraphs.

68.   The UCL defines unfair business competition to include any "unlawful, unfair, or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.  Cal. Bus. & Prof. Code § 17200.

69.   A business act or practice is "unfair" under the Unfair Competition Law if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

70.   DraftKings has violated the "unfair" prong of the UCL by falsely representing that its contests are fair and skill-based, such that an average person has a reasonable chance of winning.  DraftKings' misrepresentations and omissions regarding the fairness of its contests deceived consumers to their detriment. DraftKings' conduct caused consumers to believe falsely that they would be on a level playing field with other participants in the contest, when in fact, other participants were using material, non-public information to gain a strategic advantage on the DraftKings site, and DraftKings knew about it and sanctioned it.

71.   As a direct result of its misrepresentations and omissions, Plaintiff and the Class paid entry fees to DraftKings that they would not have paid had they known the contests were unfair. Plaintiff and the Class were induced into transactions that they

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

otherwise would not have made and suffered financial injury, harm, and damages as described in this Complaint.

72.     The gravity of the harm to members of the Class resulting from these unfair acts and practices outweighs any conceivable reasons, justifications and/or motives of DraftKings for engaging in such deceptive acts and practices.  By committing the acts and practices alleged above, DraftKings has engaged in unfair business practices within the meaning of California Business & Professions Code §§ 17200, *et seq*.

73.     Through its unfair acts and practices, DraftKings has improperly obtained money from Plaintiffs and the Class. As such, Plaintiffs request that this Court cause DraftKings to restore this money to Plaintiffs and all Class members, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### Violation of the "Fraudulent" Prong of the UCL

74.     Plaintiff realleges by reference, as if fully set forth herein, all of the above paragraphs.

75.     The UCL defines unfair business competition to include any "unlawful, unfair, or fraudulent" act or practice, as well as any "unfair, deceptive, untrue, or misleading" advertising.  Cal. Bus. & Prof. Code § 17200.

76.     A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.  DraftKings' marketing, advertising, and conduct – were "fraudulent" within the meaning of the UCL because they deceived

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiff and the Class into believing the DraftKings contests are fair and skill-based, when in fact, they are skewed towards insiders with material information such that an ordinary person does not have a reasonable chance of winning, no matter their skill.  As a result, consumers, including Plaintiff, reasonably (but falsely) believed they were entering a contest that was fair.  This perception has induced reasonable consumers, such as Plaintiff, to pay entry fees for DraftKings contests.

77.     DraftKings conduct as described herein have deceived Plaintiff and the Class. Specifically, DraftKings' misrepresentations and omissions regarding the fairness of its contests deceived consumers to their detriment. DraftKings' conduct caused consumers to believe falsely that they would be on a level playing field with other participants in the contest, when in fact, other participants were using material, non-public information to gain a strategic advantage on the DraftKings site, and DraftKings knew about it and sanctioned it. Plaintiff would not have paid entry fees to play contests on DraftKings in the absence of these fraudulent representations and omissions. Accordingly, Plaintiff suffered monetary loss as a direct result of DraftKings' practices described herein.

78.     As a result of the conduct described above, DraftKings has been unjustly enriched at the expense of Plaintiff and members of the proposed Class.  Specifically, DraftKings has been unjustly enriched by obtaining revenues and profits that it would not otherwise have obtained absent its false, misleading and deceptive conduct.

79.     Through its unfair acts and practices, DraftKings has improperly obtained money from Plaintiff and the Class. As such, Plaintiff requests that this Court cause DraftKings to restore this money to Plaintiff and all Class members, in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Violation of the "Unlawful" Prong of the UCL**

80.     Plaintiff realleges by reference, as if fully set forth herein, all of the above paragraphs.

81.     The UCL defines unfair business competition to include any "unlawful, unfair, or fraudulent" act or practice, as well as any "unfair, deceptive, untrue, or misleading" advertising.  Cal. Bus. & Prof. Code § 17200.

82.     A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

83.     DraftKings' conduct was unlawful in that it violated the Consumers Legal Remedies Act § 1770 et seq. (as set forth in the sixth cause of action).

84.     DraftKings has been unjustly enriched at the expense of Plaintiff and the Class.  Specifically, DraftKings has been unjustly enriched by obtaining revenues and profits that it would not otherwise have obtained absent its false, misleading and deceptive conduct.

85.     As a direct and proximate result of DraftKings' conduct, Plaintiff and the Class have been damaged. Through its unfair and fraudulent acts and practices,

**21**
**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

DraftKings has improperly obtained money from Plaintiffs and the Class. As such, Plaintiff request that this Court cause DraftKings to restore this money to Plaintiff and all Class members, in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### Violation of the Consumer Legal Remedies Act, California Civil Code Sections 1750, *et seq.*

86.     Plaintiff realleges by reference, as if fully set forth herein, all of the above paragraphs.

87.     This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §§ 1750, et seq. (the "CLRA").

88.     Plaintiff and each member of the proposed Class are "consumers" within the meaning of Civil Code § 1761(d).

89.     DraftKings' acceptance of entry fees from Plaintiff and the Class are "transactions" within the meaning of Civil Code § 1761(e).   DraftKings provides a "service" within the meaning of Civil Code § 1761(b) by hosting online fantasy sports games.

90.     DraftKings' conduct was unlawful and in violation of the CLRA in at least the following ways.

Cal. Civ. Code § 1770(a)(5) Representing that goods or services have characteristics, uses or benefits which they do not have;

Cal. Civ. Code § 1770(a)(7) Representing that goods or services are of a particular standard, quality or grade if they are of another;

Cal. Civ. Code § 1770(a)(9) Advertising goods with intent not to sell them as advertised; and

Cal. Civ. Code § 1770(a)(16) Representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

91.    DraftKings has engaged in unfair methods of competition and unfair and/or deceptive acts or practices against Plaintiff and the members of the Class, in violation of the CLRA, by falsely representing that its games were "fair" and games of "skill." DraftKings' conduct caused consumers to believe falsely that they would be on a level playing field with other participants in the contest, when in fact, other participants were using material, non-public information to gain a strategic advantage on the DraftKings site, and DraftKings knew about it and sanctioned it.

92.    Plaintiff requests this Court enjoin Defendant from continuing to violate the CLRA as discussed herein and/or from violating the UCL in the future. Otherwise, Plaintiff, the Class and members of the general public may be irreparably harmed and/or denied effective and complete remedy if such an order is not granted.

### SEVENTH CAUSE OF ACTION
### Negligence

93.    Plaintiff realleges by reference, as if fully set forth herein, all of the above paragraphs.

94.    DraftKings promises in its Terms of Use and in its advertising and marketing that its contests are "games of skill" and "winners are determined by the individuals who use their skill and knowledge of relevant professional sports information and fantasy

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

sports rules to accumulate the most fantasy points."

95.     DraftKings owed a duty to Plaintiff and the Class to use reasonable care to provide true, reliable, and accurate information regarding the administration of their fantasy sports games.

96.     DraftKings also owed a duty to protect the fairness and integrity of the fantasy sports games being operated on its website.

97.     DraftKings had a special relationship with the Plaintiff.  The contract between DraftKings and Plaintiff was intended to, and did, directly affect the Plaintiff; it was foreseeable that Plaintiff would be harmed by DraftKings' conduct; Plaintiff suffered a specific and concrete economic injury; Plaintiff's injury is the direct result of DraftKings' conduct; DraftKings' conduct is morally blameworthy; and, public policy supports finding a duty of care.

98.     DraftKings breached these duties to Plaintiff and the Class by failing to prevent persons possessing material, non-public information from competing against Plaintiff and the Class. DraftKings further breached this duty by knowing that employees from competitors' websites, with access to information that was of great strategic advantage, were winning large amounts of money on the DraftKings website, and yet failed to institute any sort of policy preventing this cheating from happening.

99.     As a direct and proximate result of DraftKings' negligence, Plaintiff and the Class were harmed. DraftKings' conduct significantly and materially decreased

Plaintiff's and the Class' ability to use their skills to win the fantasy sports games they entered, and Plaintiff and the Class suffered financial injury.

<h1 style="text-align:center">EIGTH CAUSE OF ACTION<br/>Conversion</h1>

100.   Plaintiff realleges by reference, as if fully set forth herein, all of the above paragraphs.

101.   Plaintiff possessed over $300. DraftKings intentionally and substantially interfered with Plaintiff's right to his money by taking it under the guise that the DraftKings games are fair. DraftKings unlawfully retained this money.

102.   Plaintiff did not consent to playing an unfair game. Plaintiff would not have given his money to DraftKings had he known the games were rigged.

103.   As a direct and proximate result of DraftKings' conduct, Plaintiff and the Class were harmed. DraftKings' conduct significantly and materially decreased Plaintiff's and the Class' ability to use their skills to win the fantasy sports games they entered, and Plaintiff and the Class suffered financial injury.

## VII.   PRAYER FOR RELIEF

Wherefore, Plaintiff requests that this Court grant the following relief:

A.     Certify this case as a class action and appoint Plaintiff as representative of the Class and appoint Plaintiff's counsel as Class counsel;

B.     Issue a declaratory judgment and an injunction declaring Defendant's deceptive practices to be unlawful and enjoining Defendant from continuing to engage

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

in the conduct alleged in this Complaint;

      C.     Award statutory, punitive, or any other form of damages provided by and pursuant to the statutes cited above;

      D.     Award Plaintiff and Class Members equitable relief including restitution and/or disgorgement;

      E.     Award reasonable attorney's fees and costs;

      F.     Award both pre-judgment and post-judgment interest;

      G.     Award such other relief as this Court deems just and equitable.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED this 20th day of November, 2015.

                      KELLER ROHRBACK L.L.P.


                      By *s/Matthew J. Preusch*
                      Matthew J. Preusch (SBN 298144)
                      1129 State Street, Suite 8
                      Santa Barbara, California 93101
                      Tel.: (805) 456-1496
                      Fax (805) 456-1497
                      mpreusch@kellerrohrback.com

                      Mark A. Griffin*
                      Mike Woerner*
                      Amy Williams-Derry*
                      David Ko*
                      KELLER ROHRBACK L.L.P.
                      1201 Third Avenue, Suite 3200
                      Seattle, WA 98101-3052
                      Tel.: (206) 623-1900

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

Fax: (206) 623-3384
mgriffin@kellerrohrback.com
mwoerner@kellerrohrback.com
awilliams-derry@kellerrohrback.com
dko@kellerrohrback.com

Jeffrey D. Kaliel*
Andrea Gold*
TYCKO & ZAVAREEI LLP
2000 L Street, N.W., Suite 808
Washington, DC 20036
Tel.: (202) 973-0900
Fax: (202) 973-0950
jkaliele@tzlegal.com
agold@tzlegal.com

Darren Kaplan*
STUEVE SIEGEL HANSON LLP
1359 Broadway, Suite 2001
New York, NY  10018
Tel.: (212) 999-7370
kaplan@stuevesiegel.com

***Attorneys for Plaintiff***

*pro hac vice forthcoming

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**